### KRAEMER et al. v. GRAF.
### No. 1840.

Circuit Court of Appeals, Tenth Circuit.
June 22, 1939.

Frank H. McFarland and Harry W. Colmery, both of Topeka, Kan. (Roy W. Cliborn, of Marysville, Kan., on the brief), for appellants.

B. J. Lempenau, of Topeka, Kan. (Ladd J. Hubka, of Beatrice, Neb., on the brief) for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

C. D. Graf as plaintiff brought this action against defendants Mohrbacher, Kreamer, and Pulleine and the Elm Creek Oil and Gas Company.

In his complaint plaintiff alleged that the defendant, Elm Creek Oil and Gas Company, with the defendants, Kraemer, Mohrbacher, and Pulleine, together with F. A. Ellenbecker, and Edgar C. Bennett, entered into a joint adventure; that the Oil and Gas Company was in effect a de facto corporation organized, chartered, created, and existing under the laws of Kansas, with its principal place of business at Marysville, Kansas, having as its president J. W. Kraemer and its secretary Thomas Mohrbacher.

Plaintiff further alleges that on or about April 7, 1926, the defendants entered into a certain joint adventure under the firm name and style of the Elm Creek Oil and Gas Company, for the purpose of engaging in the business of prospecting for oil and gas and other minerals and for the purchase and sale of leases, lands, and royalties, and drilling a test well for oil and gas in Marshall County, Kansas; that on or about said date said defendants applied to the Charter Board of the state of Kansas for a charter for a corporation under the corporate name, "The Elm Creek Oil and Gas Company," with its principal business and office in Marysville, Kansas, to take over, promote, and engage in the business of the joint adventure, having as its incorporators the said five joint adventurers, to exist for a period of 50 years, with a capital stock of $100,-000, divided into 2,000 shares of $50 each; that the application was approved by the Charter Board on April 9, 1926; that on said date a charter was issued for the Elm Creek Oil and Gas Company, having as its directors the said five joint adventurers, and as its officers, Kraemer, president, Ellenbecker, vice president, Mohrbacher, secretary, and Pulleine, treasurer, said charter in part reading as follows: "That the estimated value of the goods, chattels, lands, rights and credits owned by the corporation is One Hundred Thousand Dollars. That the amount of the capital stock of this corporation shall be One Hundred Thousand Dollars, and shall be divided into two thousand shares, of fifty dollars each. That the names and residences of the stockholders of said corporation, and the number of shares held by each, are as follows, to-wit: James W. Kraemer, Marysville, Kansas, 150; S. T. Pulleine, Marysville, Kansas, 150; Edgar C. Bennett, Marysville, Kansas, 1."

That the charter was filed on April 15, 1926, in the office of the Secretary of the State of Kansas, and on or about May 5, 1926, the said defendants and Oil and Gas Company as an alleged corporation under the corporate name entered into a written contract with the plaintiff providing that plaintiff should drill a test well on a tract known as the Elm Creek block, for oil and gas to a depth of 3,000 feet; that as consideration therefor the plaintiff should receive certain leases described in the contract and be paid the sum of $15,000, payable $3,000 at the time the well was spudded in, $5,000 when a depth of 1000 feet had been reached, and $7,000 at the time of the completion of the well; that the contract further provided: "4. If sand, satisfactory to the owner, is encountered at a depth less than

3000 feet, or if the owner shall for any other reason order operation abandoned before a depth of 3000 feet shall have been reached, or if for any reason, through the fault of the owner, abandonment occurs, or if granite is encountered before a depth of 3000 feet is reached the contractor shall be entitled to the full compensation * * *."

That the plaintiff erected a drilling rig and equipment and spudded in the well; that the defendants paid plaintiff the sum of $3,000; that plaintiff drilled the well to a depth of 1,000 feet and then demanded payment of the $5,000 installment; that the defendants refused to pay such installment; that plaintiff continued the drilling to a depth of 1,220 feet; that the defendants failed and refused to pay the installment of $5,000 and thereupon plaintiff abandoned the drilling of the well; that after such abandonment the defendants made payments aggregating $3,000; that on October 23, 1926, the defendants executed a writing in which they admitted an indebtedness to the plaintiff of $9,000; that thereafter the defendants paid an additional $2,000 to one A. H. Krueger, which under agreement plaintiff credited on the indebtedness to him; that the defendants have failed and refused to pay the balance of $7,000 with interest. In his complaint in paragraph 20 plaintiff further alleged:

"20. Further complaining of the said defendants this plaintiff says that in order to induce this plaintiff, C. D. Graf, to enter into and execute the contract and agreement herein referred to as 'Exhibit C,' the said defendants, James W. Kraemer, Thos. Mohrbacher, and S. T. Pulleine, stated and represented to this plaintiff that the corporation known as the Elm Creek Oil and Gas Company had been formed and the incorporation completed and that more than Thirty-five Thousand Dollars ($35,000.00) had been subscribed for capital stock of the said corporation, and a large part of such stock had been issued and that the same either had been or would be paid for promptly and that stockholders and subscribers were liable for the payment of stock in the amount of their subscription and that funds were and would be available for the payment of the debt created and evidenced by the agreement referred to herein as 'Exhibit C' and that the said defendants were financially responsible and capable and able to pay and carry out their said contract and agreement with this plaintiff. The said defendants further represented to this plain-tiff that Thirty-five Thousand Dollars ($35,000.00) worth of stock certificates had been issued by the said corporation and paid for by the certificate holders, and that the said Thirty-five Thousand Dollars ($35,000.00) worth of stock certificates had been deposited with the Blue Sky Board of the State of Kansas as, and that the same was, full and ample security and protection for those dealing and transacting business with the said defendants. That this plaintiff, believed and relied upon the said statements so made by the said defendants, and was induced thereby to enter into the said agreement, herein referred to as 'Exhibit C,' and did the said work, provided for therein, and in the prosecution of the same, contracted and incurred debts to the extent of several thousand dollars, and relying upon, and trusting, and believing, the said defendants, and their said statements, proceeded in good faith and confidence to perform and carry out all of his agreements with the said defendants. But the said statements and declarations of the said defendants were false and untrue, and were well known by the said defendants, at the time they made them to this plaintiff to be false and untrue, and the said defendants made the said statements and declarations to this plaintiff for the purpose of deceiving him and defrauding him and inducing him to enter into the said agreement and its performance."

That after the abandonment of the well, plaintiff learned that the incorporation of the Oil and Gas Company had not been completed; that it had not been authorized to do business; that no affidavit had been filed as required by law stating that no less than 20 per cent of the corporation's authorized capital had been paid in cash or in property equivalent thereto; that only $170 had been expended by the defendants in acquiring all the property owned or pretended to be owned by the alleged corporation.

Plaintiff prayed judgment against the corporation and the individual defendants for $7,000 with interest from October 23, 1926.

The said defendants answered denying the allegations and pleaded a compromise settlement entered into in 1927 prior to the commencement of the action. In his reply, plaintiff denied such compromise settlement. The cause was tried to the court without a jury, which found the issues in favor of the plaintiff and rendered judgment against said defendants for $11,865,

with interest at six per cent. per annum from the date of the judgment.

The individual defendants have appealed.

The facts are as follows:

During the years 1925 and 1926, Kraemer, Mohrbacher, Pulleine, and Ellenbecker became interested in ascertaining whether oil and gas could be found in paying quantities in Marshall County, Kansas. Ellenbecker, being engaged in the real estate business, devoted practically all his time for the period of more than a year in securing a block of leases. Leases on 14,000 acres were secured in units of approximately 160 acres per lease at $1 per lease. In a few instances the price was $1 per acre. Ellenbecker contributed his time and Kraemer, Pulleine, and Mohrbacher paid all the expenses up to and including the incorporation of the Elm Creek Oil and Gas Company, aggregating about $2,000. In April, 1926, the four parties above mentioned went to Edgar C. Bennett, an attorney at Marysville, Kansas, and employed him to form a corporation for the purpose of prospecting for oil and gas, and said application was prepared and filed in accordance with the laws of Kansas on behalf of the Elm Creek Oil and Gas Company. Bennett, having contributed his services as an attorney, became one of the incorporators. Its assets consisted of the block of leases which was assigned to it on the basis of $2.50 per acre. Stock in the corporation was issued in exchange for leases and for services rendered and to be rendered. Each incorporator received 140 shares, an aggregate of 700 shares at the par value of $35,000. The corporation, through its president and secretary, failed to file an affidavit setting forth that not less than 20 per cent. of its authorized capital stock had been paid in cash or in property as provided by Section 17-214, G.S.Kan.1935.

Subsequent to the issuance of the charter, a stockholders' meeting was held, at which the charter was accepted, directors elected and by-laws adopted. Officers were elected, bank account opened in the name of the corporation, stock books opened, and application made to and license secured from the State Blue Sky Department to sell stock, stock of the incorporators being deposited with the Blue Sky Department. The stock being sold to the public; reports were made to the Secretary of State, the Bank Commissioner, and the United States Internal Revenue Collector, according to law. Minutes of meetings were kept, and contracts entered into, and payments made in the name of the corporation covering a period of approximately three years. A charter had been granted and all preliminary organization to complete incorporation had taken place prior to May 25, 1926, the date on which the contract was entered into in the name of the corporation with C. D. Graf for the drilling of the test well.

At the time the contract was signed, Graf's attention was specifically called to the fact that he was not dealing with individuals, but strictly with the corporation. With respect to the allegation of fraud, Graf testified: "I had a conversation with them prior to the time we entered into the second contract in which I told them, 'This money should be put up in the bank before I start any operations whatsoever.' They said I had nothing to worry about, they were old timers. They had made arrangements with the bank to borrow this money in case they had to, if they did not sell their stock. They were going to sell their stock and they also had leases to sell. They were supposed to sell it for cash, that is what they told me at that time. That was the first night I was there, Mr. Kraemer, Mr. Mohrbacher, Mr. Pulleine, Mr. Ellenbecker and myself were present. At the time I entered into the contract, Exhibit No. 2, and prior thereto there were no representations made to me by any of these parties with regard to what moneys they had or were able to get. They made no statement at that time as to how much money they had raised or how much stock they had sold except their $35,000 they put up as stock there at first. I don't just recall as to how that was exactly, whether they told me they had put up or had $35,-000.00 worth of stock sold, but that was, I think, the intention. They said they had the money to drill the well with. I had nothing to worry about. It was Mr. Kraemer and Mr. Mohrbacher, Mr. Bennett, I believe, at that time. All five of these people were associated together in this adventure. I relied on the statement of these parties in entering into this contract."

The well was started and payments were made until a depth of 1,216 feet was reached, at which point drilling was stopped because of inability of the corporation to make further payments. Later, additional funds having been secured and paid to Graf or on his order, drillings were occa-

sionally resumed. After crediting all payments made by the corporation on the contract, there was a balance of $7,000 to be paid when a depth of 3,000 feet was reached or prior thereto in the nature of a bonus.

Subsequently, negotiations were entered into between Graf and the Oil and Gas Company and others which finally culminated in a four-way agreement, by virtue of which the difference between Graf and the Oil and Gas Company was adjusted and settled.

Graf admitted that he entered into the four-way contract.

■ The failure to file the certificate required by Section 17-214, supra, did not prevent the Oil and Gas Company from being a de facto corporation.

In Murdock v. Lamb, 92 Kan. 857, 142 P. 961, 963, the court said:

"Individual liability is imposed upon corporation promoters for debts which they have incurred when they fail to take the steps essential to incorporation. If incorporation occur, there is no liability in the absence of a statute imposing it. In this case incorporation was an accomplished fact. A charter was procured and filed, capital stock was fully subscribed and paid in, officers were elected, and managing agents were appointed, by-laws were adopted, and every requirement of the law essential to complete corporate organization was met. The statute imposes no duty upon incorporators. The filing of the affidavit is not a step in corporate organization or a condition precedent to corporate existence. The statute presupposes valid corporate existence, and makes it the duty of the corporation itself to file the affidavit of its president and secretary, showing the prescribed facts. Failure to do this does not constitute delinquency on the part of the promoters or stockholders. It is a corporate fault, and not a personal fault of incorporators who have done everything required of them as such. No penal consequences can be visited on them in the absence of a statute, and the statute is silent as to the consequences flowing from its nonobservance.

"When statutes are framed in this way it is well settled that contracts made by authorized corporate agents on behalf of the corporation are valid obligations of the corporation. Persons dealing with the corporation cannot object that the statute was not observed. The state alone can complain, and its remedy is to discipline the

105 F.2d—8½

corporation according to some common-law method. State v. Book Co., 69 Kan. 1, 76 P. 411, 1 L.R.A., N.S., 1041, 2 Ann.Cas. 56, and cases cited in the opinion; Beal v. Childress, 92 Kan. 109, 112, 139 P. 1198; Whitney v. Wyman, 101 U.S. 392, 25 L.Ed. 1050; First National Bank of Salem v. Almy, 117 Mass. 476."

See, also, Root v. Wear, 98 Kan. 234, 157 P. 1181.

In Douglass v. Midland Oil Company, 121 Kan. 448, 247 P. 1048, 1049, the court said: "It was alleged in the petition and the evidence produced tended to show that an association of persons, including Cully, proceeded to organize a corporation designated as the Midland Oil Company; that a charter was applied for and obtained and an application made to state authorities for permission to sell the securities issued by the company. Leases had been secured, and the contract for drilling was made, which was signed by one of the association as trustee for the company. While the incorporation had not been fully completed, officers had been chosen, the interests of the parties in the company were determined, the leases were turned in as assets of the company on a basis agreed upon and for which shares of stock to specified persons were to be issued and delivered. It therefore appears that the association had the essential elements of a de facto corporation, the existence of which could not be collaterally attacked."

■ The Oil and Gas Company in this case was a de facto corporation. The individual incorporators were not liable as joint adventurers.

The proof showed that the incorporators assigned leases to the corporation in payment of their subscriptions for capital stock, there being no proof that the leases were not of the value placed thereon. The judgment was not predicated on amounts due for stock subscriptions, being a joint and several judgment against each of the individual defendants.

■ The allegations of fraud in the complaint were insufficient. Neither was there sufficient proof of fraud nor proof of damage resulting from fraud.

■■ Assuming that there was proper allegation and proof of fraudulent misrepresentations which induced the plaintiff to enter into the contract with the corporation, the measure of damages is not the balance due on the contract which was not com-

pletely performed by the plaintiff. He drilled less than half of the 3,000 feet. His actual loss was the difference between the cost and expense of drilling to 1,216 feet, plus a reasonable profit, and the amount actually received. The rule of measure of damages for fraud is stated in 27 C.J. p. 89, Section 239, as follows: "The general rule applicable to the measure of damages for fraud is that such an amount should be awarded to plaintiff as will compensate him for the loss occasioned by the fraud, or as it has been expressed, plaintiff is entitled to recover damages adequate to the injury which he has sustained. Plaintiff can recover the entire amount of his loss occasioned by the fraud, but the recovery must be limited to the actual loss."

Further, it appears from the evidence that the claim of plaintiff was fully settled and adjusted by the four-way contract entered into in 1927.

The judgment is reversed and the cause remanded with instructions to dismiss the complaint.